Davis, Judge,
delivered the opinion of the court:
Helene Guiris, a concern better known as a purveyor of cosmetics but also possessing general experience in the compounding and packaging of more mundane chemicals, contracted with the Army in 1951 and 1952 to supply large quantities of a disinfectant chlorine powder to be used by troops in the field — the Korean hostilities were then in progress — to disinfect mess gear and fresh fruits and vegetables. This disinfectant had been developed after World War II by the Office of the Quartermaster General in conjunction with two universities and two chemical companies, one of which was Wallace & Tiernan, Inc. Wallace & Tier-nan was the sole source of chlormelamine, the disinfectant’s active ingredient, which in solution released chlorine molecules to kill bacteria and germs. Chlormelamine is a generic term, covering several types of a chemical with different numbers of chlorine molecules (mono-, di-, tri-, tetra-, penta-, and hexa-chlormelamine); the types with five or six molecules are virtually insoluble while tri-chlormelamine is adequately soluble. In 1951 chlormelamine was a new and patented chemical, and its properties were not widely or generally known. The disinfectant based on it had never been mass-produced.
When the Korean hostilities increased the immediate need for a field disinfectant of this kind, the Army prepared a specification for the product, which was issued in August *440 1951. This specification was very skimpy; it provided that the disinfectant (called “disinfectant, chlorine, food service”) was to be “a uniformly mixed powder or granular material,” composed of chlormelamine and three other ingredients in specified maximum and minimum percentages by weight. With respect to the active ingredient, chlormelamine, the specification simply gave directions as to the percentage of titrable chlorine, moisture content, and color. For the finished product, requirements were given for the percentage of titrable chlorine, solubility, and particle size (among others not now pertinent).
On the basis of this specification, the Army put forth, in September 1951, an invitation to bid on a contract to supply 2,251,000 pouches of the disinfectant, all deliveries to be completed by June 1952. Plaintiff received an invitation, and began a study to see whether it should participate. Concentrating on the novel chemical chlormelamine, plaintiff’s employees (a) obtained a five-pound sample of that chemical from Wallace & Tiernan, (b) formulated a small batch of chlormelamine in their own laboratory, (c) examined the technical literature on the chemical, (d) studied the military specification, and (e) compounded by simple mixing several laboratory batches of the disinfectant to be produced. As a result of its inquiries, plaintiff concluded that chlormelamine was a fine, free-flowing powder, and that the disinfectant could be produced by simply mixing that powder with the other ingredients, without any grinding of the chlormela-mine particles. Plaintiff’s bid was made on this basis. Of the eleven bids received by the Army, plaintiff’s was the lowest, and it received the award of its first contract for the disinfectant on November 8,1951.
Our findings portray plaintiff’s tribulations in manufacturing the disinfectant after it began production in January 1952. In that month it successfully manufactured a 175-pound batch of the disinfectant, and then a 1,000-pound (production size) batch, by using a simple mixing process. But the succeeding production-size batches failed to meet the solubility test of the specification. Considerable study convinced plaintiff that simple mixing would not produce the required product but that it was necessary to grind the *441 cblormelamine so as to reduce its particle size in order to meet tbe solubility standard. Grinding of the chlorine ingredient led to several production problems, and further study and experimintation was then needed to develop manufacturing techniques which would overcome these new and unexpected difficulties — difficulties which brought increased costs and burdens. As a result of the problems encountered because of the need for grinding (as well as the blending problem, still to be discussed), the sum of plaintiff’s costs on this contract exceeded its bid by over $90,000; of this amount, some $60,000 was attributable to the unforeseen need for grinding (and the complications it brought in train).
In April 1952 plaintiff was awarded a second contract, for over 3,300,000 more pouches of the disinfectant. The invitations for this contract (with the same specification) were issued on December 12, 1951, and plaintiff submitted its bid on January 17, 1952, immediately prior to the bid opening. This offer was founded on plaintiff’s knowledge at that time, and still assumed that mixing would be sufficient to meet the contract requirements, without any need for grinding. An award was due to be made within 30 days of opening, but on February 4 plaintiff gave the Army an extension of 60 days to ¡make the award. Within this extended period, plaintiff learned definitively of the necessity to grind and the resultant extra costs. It contemplated withdrawing its bid on the second contract but did not do so, nor did it seek to increase its bid; instead, it granted the Army, on April 18, 1952, a further 15-day extension within which to accept the original bid. The second contract was awarded to plaintiff on April 23d.
Even after it had discovered the need for grinding and had solved (at higher cost) the ensuing difficulties, plaintiff met serious problems in producing the disinfectant under both the first and the second contracts. It was not able to overcome these additional obstacles completely until it discovered, in December 1952, that Wallace & Tiernan, from whom it was purchasing the chlormelamrn e ingredient, was not shipping individual batches as they were manufactured but was blending several batches together and supplying this blended cblormelamine. At that time plaintiff asked that only the *442 unblended ingredient be sent to it, and thereafter its production continued without serious interruption throughout the remainder of the two contracts. Apparently the difficulties had been due to the fact that, while each batch of chlormela-mine manufactured by Wallace & Tiernan was uniform in itself, there were significant and obvious differences between units. A succession of different batches each of which was uniform in itself could be handled appropriately, but blended batches caused grave trouble. Of the plaintiff’s $90,000 loss on the first contract, about $60,000 was (as we have said) due to grinding problems while the remaining $80,000 flowed from the shipment by Wallace & Tiernan of these blended batches. On the second contract, plaintiff lost almost $99,000; there is no breakdown between the extra costs allocable to the grinding problem and those attributable to the blending difficulty.
Plaintiff’s suit for these additional costs is founded on its claim that (a) the Army knew of the need for grinding as well as of the probable consequences of lack of uniformity in batches of chlormelamine; (b) plaintiff neither had nor had reason to have this information, as the Army knew; and (c) the Army failed to supply the information to plaintiff (either in the specification or otherwise), and this failure misled plaintiff. Alternatively, the plaintiff asserts that the specification was affirmatively misleading as to the method for making the disinfectant. In considering these claims, we first take up the problem of grinding the chlormelamine. We agree with the Trial Commissioner and find as facts that at the time of the first contract (i) the Army knew that grinding (which is more troublesome and costly than mixing) would in all probability be necessary, not because the specification required that process but because the end-product could not in fact be made without it; (ii) on the basis of the data it had or should be expected to obtain, plaintiff reasonably expected that the job could be done by simple mixing, without grinding; (iii) the Army was aware that plaintiff (and most of the other bidders) expected to produce the disinfectant without grinding; (iv) the contract specification did not inform or alert plaintiff as to the probable need for grinding; and (v) the Army did not otherwise *443 inform plaintiff of this fact. The evidence which is summarized in the subsidiary findings sustains these conclusions of fact. Possessing special knowledge of the characteristics and uncertainties of chlormelamine as well as of the putative problems of compounding the end-product, the Government gave no hint of the necessary information, either in the specification or in the other contract documents. Rather, the Government permitted plaintiff, which it knew to be relatively innocent of these complexities, to enter a bid for this novel product and undertake a process of manufacturing which was undoubtedly planned without the significant information as to grinding possessed by defendant.
The question remains whether this conduct on the part of the Government amounted to a breach of contract. The defendant insists not. It says that unforeseen difficulties do not entitle a contractor to increased compensation; that the specification in this case was an end-product specification which did not require any particular method or process of manufacturing the disinfectant; and that the Government contracted for plaintiff’s technical know-how and manufacturing skills, depending on it to produce the end-product. We can accept these general propositions but they do not decide this concrete case. Where the Government has made no misrepresentations, has no duty to disclose information, and does not improperly interfere with performance, the fixed-price contractor of course bears the burden of unanticipated increases in cost (Rolin v. United States, 142 Ct. Cl. 73, 81-82, 160 F. Supp. 264, 268-69 (1958)); the Government can rightly rely on him to fulfill the agreement he chose to make. In the same way, an end-product specification normally leaves it to the contractor to perform as best he can (John Thomson Press and Mfg. Co. v. United States, 57 Ct. Cl. 200, 209 (1922); cf. Anthony M. Meyerstein, Inc., v. United States, 133 Ct. Cl. 694, 700-01, 137 F. Supp. 427, 431 (1956)), but that does not excuse the defendant from liability if it breaches an independent duty to reveal data or if the end-product specification embodies a material misrepresentation misleading the contractor.
This is a case in which we have, in connection with the grinding of the chlormelamine, both a failure of the Gov *444 ernment to tell what it should and a Government specification which in its context was actively misleading. There are many contracts — generally relating to known or standard products, or where the ratio of actual and potential knowledge definitely favors the contractor, or where a contractor can reasonably be expected to seek the facts for himself — in which the Government may be under no duty to volunteer information in its files. Cf. Shayne Bros., Inc. v. United States, 134 Ct. Cl. 154, 137 F. Supp. 433 (1956). But as our rulings show, there are other instances in which the defendant is clearly under such an affirmative obligation and cannot remain silent.[1]
Under the principle of these latter decisions, the circumstances here gave rise to a duty to share information. The disinfectant was novel and had never been mass-produced; the Government had sponsored the research and knew much more about the product than the bidders did or could; it knew, in particular, that the main ingredient, chlormelamine, was a recent invention, uncertain in reaction, and requiring extreme care in handling; it also knew that the more costly process of grinding would be necessary to meet the requirements of the specification, but that in their understandable ignorance the bidders would consider simple mixing adequate; and the urgency for the disinfectant was such that potential contractors could not expend much time learning about it before bidding. In this situation the Government, possessing vital information which it was aware the bidders needed but would not have, could not properly let them flounder on their own. Although it is not a fiduciary toward its contractors, the Government — where the balance of knowledge is so clearly on its side — can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word. Cf. Cardozo, J. in Globe *445 Woolen Co. v. Utica Gas & Elec. Co., 224 N.Y. 483, 489, 121 N.E. 378, 380 (1918).
On similar grounds, we bold the specification for the disinfectant to have been misleading with respect to grinding. This was not merely a specification for an end-product, without any implications at all as to method of manufacture. To reasonable bidders it erroneously implied, in its context, that grinding would not be necessary to make the desired item; and in the circumstances defendant should have known that this would be the inference. Specifications so susceptible of a misleading reading (or implication) subject the defendant to answer to a contractor who has actually been misled to his injury. United States v. Spearin, 248 U.S. 132, 137 (1918); Railroad Waterproofing Corp. v. United States, 133 Ct. Cl. 911, 915, 137 F. Supp. 713, 719 (1956); Arcole Midwest Corp. v. United States, 125 Ct. Cl. 818, 113 F. Supp. 278 (1953).
The plaintiff is therefore entitled to recover that part of its loss on the first contract attributable to the necessity to grind the chlormelamine, i.e., the sum of $60,315.38. It cannot, however, recover any comparable damages on the second contract because at the time it entered into that agreement late in April 1952 it was no longer misled. It agreed of its own choice on April 15 to extend the Government’s time to ¡make an award; on that date and for some time before it knew full well about the grinding problem. Nevertheless, it made the extension agreement with its eyes open and therefore when the contract award was subsequently made on April 23 it could no longer assert that it was relying on a misrepresentation. Cf. Anthony M. Meyerstein, Inc. v. United States, 133 Ct. Cl. 694, 700, 137 F. Supp. 427, 431 (1956); Leal v. United States, 149 Ct. Cl. 451, 460, 276 F. 2d 378, 383 (1960); Ragonese v. United States, 128 Ct. Cl. 156, 162, 120 F. Supp. 768, 770-771 (1954).
Plaintiff’s second claim of misrepresentation relates to Wallace & Tieman’s practice of blending together different batches of chlormelamine before shipping it to plaintiff; from this blending stemmed the difficulties causing one-third of the loss on the first contract and an undetermined portion of the loss on the later contract. We reject this claim. The *446 findings do show, as plaintiff asserts, that the Army knew that the chlormelamine supplied by Wallace & Tiernan was not uniform from batch to batch, and also that the Army understood to some extent that problems would arise if this ingredient were not homogeneous. But the significant fact is that the Government did not know, or have reason to know, that Wallace & Tiernan was blending together different batches of chlormelamine. It was this blending, unknown to both plaintiff and defendant, which proximately caused those undue production difficulties which were not attributable to the need for grinding. As proved by its experience after the blending was discontinued, plaintiff could deal adequately with a varying succession of batches so long as each batch was homogeneous in itself. To hold the defendant liable for the excess costs due to blending, we would have to find both that (a) the Army was obliged to tell the bidders (in the specification or some other fashion) that the chlormelamine differed from batch to batch in chlorine content, and (b) the failure to impart this piece of information materially impeded the plaintiff in discovering that Wallace & Tiernan was blending different batches. Assuming but not deciding the first proposition,[2] we cannot say that there was a sufficiently close connection between the information withheld and the delayed uncovering of Wallace & Tiernan’s manufacturing process. As plaintiff’s own experience goes far to show,[3] the link is too tenuous to find the necessary causal relationship; plaintiff has not proved that it was in fact misled as to the existence of blending within batches by the failure to alert it to the variations in chlorine content between different batches of chlormelamine.
*447 Nor can we accept plaintiff’s alternative argument that the Army’s specification, by providing requirements for the ingredient chlormelamine as well as for the end-product, warranted that a contractor using chlormelamine which met those basic requirements would necessarily be able to produce a satisfactory end-product. The ingredient provisions of the specification were minimal, not exhaustive, requirements,[4] and, except for the belief with respect to mixing the chlormelamine, there is no background from which to infer that on the basis of the specification the contractors could reasonably expect smooth sailing by simply running close to the minimal standards. The specification term “chlormelamine” was known to be a generic name for a chemical with several variations depending on the number of chlorine molecules — an all-important fact for this end-product. There was no sufficient ground for thinking that any “chlormelamine” within the minimal specification requirements would necessarily, without more, lead to a disinfectant meeting the demands of the specification.
The last of plaintiff’s claims relates to the “C-l bag” problem. Plaintiff purchased the bags in which the disinfectant was to be packaged from Central States Paper and Bag Company, which furnished an affidavit that the bags passed the required Government waterproofing standard; the bags were also pre-approved and pre-accepted by an Army laboratory. Nevertheless, toward the end of September 1952, the Government’s resident inspector at plaintiff’s plant began rejecting the bags on hand because the bottom seam was not sufficiently waterproof. On September 29, 1952, the defendant put into effect a hold order prohibiting further use of these bags until the problem could be solved. This order lasted 30 days, interrupting production of the final product. In the course of the hold period, some experimentation was carried on and conferences held in an effort to overcome the bottleneck. It was finally agreed toward the end of October to tape the bottom seam of the bags before they were put on the production line, and work was resumed on October 27. Plaintiff suffered $3,707.53 in excess costs during this 30-day stop order. The defendant, we hold, is *448 responsible for these extra expenses. The bags were not adequately waterproof — through no fault of plaintiff’s — but the delay of 30 days was unjustified. Much less time should have been consumed. The unreasonable duration of the stop order was due to the ambiguity of the bag specifications which caused uncertainty among defendant’s representatives, and to the failure of the Government officials to accept for almost a month the suggestion made by plaintiff and Central States (on September 30, the day after the hold order was issued) to cure the defect by taping the bottom seam. Where the defendant causes an unnecessary delay of this type through a hold order, it must respond in damages for the additional costs incurred by the contractor.[5] The defendant says that plaintiff has already settled this very claim with its supplier, Central States, but we find that the damages actually recovered from that company related only to the additional costs of taping the bags once the hold order was lifted, not to the excess expenses during the period of the hold order. The present claim involves only the latter.
Accordingly, plaintiff is entitled to recover $60,315.38 (for additional costs due to the need for grinding the chlormela-mine on the first contract) and $3,701.53 (on the C-1 bag claim). Judgment will be entered for plaintiff in the amount of $64,022.91.
Need, Justice {Bet.), sitting by designation; Durfee, Judge; Laramore, Judge; and Jones, Ghief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and arguments of counsel, makes findings of fact as follows:
1. Plaintiff is an Illinois corporation with its principal office and place of business in Chicago, Illinois.
*449 2. For many years prior to 1951, and continuously to the present time, plaintiff has been engaged in the mass compounding and packaging of chemical products. Plaintiff was in 1951, and is, skilled and experienced in the mass compounding and packaging of chemicals. In addition, plaintiff was in 1951, and is, experienced in the procedures of Government procurement, having obtained and performed numerous Government contracts for the manufacture of chemical products during World War II and in subsequent years.
3. (a) On September 27, 1951, the New York Quartermaster Procurement Agency of the United States Army (NYQMPA) issued invitations to bid (Invitation No. QM-30-280-52-316) on a supply contract for 2,251,000 pouches of disinfectant, chlorine, food service. A copy of the military specification for the disinfectant, MIL-D-11309, dated August 6, 1951, was enclosed with each invitation to bid. The invitations were mailed to 128 companies, including plaintiff. Under the terms of the invitation, bids were required to be submitted and received by NYQMPA no later than October 26,1951.
(b) The delivery schedule set forth in the invitation was as follows:
400,000 packages during February 1952
400,000 packages during March 1952
400,000 packages during April 1952
400,000 packages during May 1952
651,000 packages during June 1952
The invitation stated that “[b bidder should not ofer alterna-dme delivery schedule. Bids containing proposed delivery schedules which deviate from the proportionate monthly requirements stated herein will not be considered for award except that acceleration of deliveries will be permitted.”
4. Disinfectant, chlorine, food service was designed for use by troops in the field for the disinfection of mess gear and fresh fruits and vegetables. The Korean War was in progress at the time the invitations to bid were issued, and the need for the disinfectant was urgent throughout 1951 and 1952. Because of the Korean emergency, the military specification for the disinfectant was issued without being co *450 ordinated by tbe Army with, the other agencies of the Department of Defense.
5. Prior to September 27, 1951, disinfectant, chlorine, food service had never been mass produced. The development of this product was begun at the end of World War II and continued until the issuance of the military specification in August 1951. The Office of the Quartermaster General of the Army desired to develop a new disinfectant and to that end worked in conjunction with Harvard and Rutgers Universities and with two chemical manufacturing companies, Wallace & Tiernan, Inc., of Belleville, New Jersey, and Economics Laboratory, Inc. (Research & Development Division), St. Paul, Minnesota. The Quartermaster had research contracts with both Harvard and Rutgers, but neither Wallace & Tieman nor Economics Laboratory received compensation for their services. Dr. Ray Treichler, who was head of the Biologicals Unit, Chemicals & Plastics Section, Research and Development Branch, Office of the Quartermaster General, and Dr. Paul Edens, his assistant, coordinated the development of the disinfectant and worked closely with Dr. Marks, Director of Chemical Research at Wallace & Tieman, Dr. Wilson, Director of Research at Economics Laboratory, and Dr. Chang of Harvard University.
6. The active ingredient of the new disinfectant, as described in the military specification, was, and is, “chlor-melamine”. It is this chemical which, when placed in solution, releases “active” chlorine molecules that kill the bacteria and germs present on the mess gear or fruits and vegetables to be disinfected. Chlormelamine is a generic term which includes, depending on the number of chlorine molecules present, mono-, di-, tri-, tetra-, penta-, and hexachlormelamine. Chlormelamine was in 1951 a new and patented chemical, and its properties were not widely or generally known. The sole manufacturer and source of chlormelamine was at all pertinent times Wallace & Tiernan, Inc.
7. During the period that the disinfectant was being developed, numerous communications passed between Dr. Treichler of the Army, Dr. Wilson of Economics Labora *451 tory, Dr. Marks of Wallace & Tiernan, and Dr. Chang of Harvard University.
(a) Dr. Wilson, in a letter to Dr. Treichler, dated October 5,1949, stated in part:
Sterlamine is trade name now used by Wallace & Tier-nan Company, Inc. for their industrial preparation of Chlormelamine. Pure chlormelamine in form suitable for this type of application [i.e., in a disinfectant] from the standpoint of solubilization, etc. is not now available. For that reason we are using a preparation of Chlormelamine intimately powdered with solubilizers and inert carrying agents making it suitable for this use. * * * Because of the variation in lot to lot of the chlormelamine content of the Sterlamine preparation, the exact percentage of Sterlamine may vary within limits of 1% or 2%. This variation is accommodated by a similar variation in the proportion of monosodium dihydrogen orthophosphate used.
(b) Dr. Wilson, in a letter dated June 26, 1950, a copy of which was sent to Dr. Treichler, answering an inquiry regarding the disinfectant, stated in part:
I think it might be more helpful to you to refer you to Dr. Ray Treichler. * * * Dr. Treichler has been kept informed concerning every step of our work on this product over the past 2 or three years. Furthermore, he has had samples for his own checking and has had tests run of them by two or three or more independent laboratories.
(c) Dr. Wilson, in a letter to Dr. Treichler dated August 7,1950, stated in part:
We will work on specifications as fast as possible and keep you advised concerning progress.
(d) Dr. Wilson, in a memorandum dated September 25, 1950, a copy of which was received by Dr. Treichler, regarding a conference attended by Drs. Treichler, Marks, Chang and Wilson, in Washington, on September 18, 1950, stated in part:
The purpose of the meeting was to go through together the tentative specifications for “Disinfectant, Food Service, Chlorine” which had been worked out in the meantime from the start, made by Dr. Marks and JLW [Dr. Wilson] in the Hotel in New York on Au~ *452 gust 1. The particular revision considered on the evening of the 18th was the one resulting from the conference of Dr. Treichler, JLW [Dr. Wilson], HCM [Dr. Marks] and FL in St. Paul on September 13. * * *.
A second purpose of this conference was to exchange information obtained by each of us in the meantime and especially to study the results of Dr. Chang’s intensive investigations made since our last meeting. Dr. Chang has done an immense amount of work since our last conference and obtained a great deal of very important and interesting information concerning the action of Chlormelamine in solution.
It was decided to return to the designation “Chlor-melamine” instead of “Trichlormelamine”.
(e) Dr. Marks, in a letter to Dr. Wilson dated September 29,1950, a copy of which was received by Dr. Treichler, stated in part:
In accordance with our telephone conversation of yesterday we have shipped you under separate cover, air mail, parcel post, special delivery about three-quarters of a pound of micronized chloromelamine mixture. * * * It was treated in a micropulverizer and the average particle size brought down to about 5 microns. * * *
^ í»
* * * Let us keep in close touch with each other because we are now under considerable pressure to arrive at a formulation which is satisfactory.
(f) Dr. Wilson, in a letter to Dr. Treichler, dated October 2,1950, stated in part:
On September 18 we received a wire from the [NYQMPA] on 240 packages of “Disinfectant, Food Service, Chlorine — MIKROLENE 3.35 oz. each” and also a request for quotation on an additional 300 packages of same.
We had to do some scrambling to line up available packing before we dared quote, but did quote on September 28 per attached wire.
For your information, the formula used was as, follows:
20% Special Chlormelamine*
18% Sulframin AB Cone.
62% Monosodium phosphate, anhydrous
*453 I am sending you under separate cover one small case of what we propose to supply on this material if our bid is accepted.
$ $ $ & ‡
P.S. Since above was written I have received a telegram for 600 packages to be delivered Brooklyn not later than October 23.
(g) Dr. Treichler, in a travel report dated June 29, 1951, regarding a conference at Harvard University, which he attended with Drs. Wilson and Marks, and Drs. Chang and Fair of Harvard, stated in part :
_ A satisfactory formula for use as a Disinfectant, Chlorine, Food Service has been prepared and is being extensively investigated. Investigations are not complete but have progressed sufficiently to permit adoption of the formulation. A preliminary draft of the specification for Disinfectant, Chlorine, Food Service has been prepared, informally coordinated and is currently being re-drafted incorporating desirable changes.
8. The military specification for the disinfectant was originally drafted by Di*. Wilson with the assistance of Dr. Treichler’s office. Dr. Marks participated with them in drafting the requirements for the ingredient chlormelamine. Dr. Treichler visited the Wallace & Tiernan plant and observed certain operations in the manufacture of chlormela-mine, although he was not made familiar with the details of its manufacturing processes. He was informed concerning the pilot batches produced by Economics Laboratory and also visited its plant. Dr. Treichler and his office at all times participated in and were kept fully informed concerning each phase of the development of the disinfectant. The specification as adopted by the Quartermaster, under date of August 6,1951, was in all substantial respects the same as that recommended by Dr. Treichler and his office.
9. Prior to September 1951, Dr. Treichler knew that the disinfectant was most difficult to produce and that production required specialized equipment and technical know-how based upon past experience. Dr. Treichler also knew that extreme care must be exercised in handling the components and the finished product. Further, he was aware that it was necessary to grind at least a portion of the *454 finished formulation, including all of the chlormelamine and surface active agent, in micronizing equipment in order to meet the test for solubility[6] set forth in the military specification. Grinding was necessary, he knew, because the particle size of the chlormelamine produced by Wallace & Tiernan, even though it might satisfy the particle size requirement for the finished product, was frequently too large to permit dissolution within the required time. He also was aware that chlormelamine produced by Wallace & Tiernan was not uniform from batch to batch and would vary slightly as to particle size, chlorine content and texture. Finally, Dr. Treiehler knew that chlormelamine which met the specification requirements for that ingredient might well contain significant portions of relatively insoluble chlormelamines, such as hexachlormel amine and pentachlormelamine. The presence of such chlormelamines, he knew, was extremely difficult and expensive to detect and yet might cause the finished product to fail the test for solubility. And he was aware that manufacturers generally would not be equipped to detect the presence of such chlormelamines or to segregate them. It was obvious to the defendant’s representatives at that time that those bidding on the contracts awarded to the plaintiff, including the plaintiff, were generally unaware of the problems facing them.
10. In late September 1951, Mr. Eaymond K. Myerson, Government Contract Manager for plaintiff, visited the offices of the New York Quartermaster Procurement Agency and particularly the office of Mr. Donald D. Davis, Purchasing Agent for the NYQMPA, Mr. Bernard H. Martin of the Industrial Mobilization Division of NYQMPA, and Major John P. Anninos, a contracting officer at NYQMPA (Major Anninos was the contracting officer responsible for the contracts concerned in this suit). Such visits to Government contract agencies were part of Mr. Myerson’s job as Government contracts manager. A discussion was had concerning the particular procurement now in dispute and Mr. Martin requested that Plelene Curtis seriously consider *455 bidding on the disinfectant rinse contract. Mr. Davis showed Mr. Myerson a pouch of the material required under the contract. There is an unresolved dispute as to whether the defendant’s representatives assured Myerson at this time that the contract required only a simple mixing of specified ingredients, but resolution of the dispute is not essential to determination of the controversy. Mr. Myerson then obtained a copy of the military specifications in a room on a lower floor from the office where the above conversation took place and returned with the specifications to his employer. An invitation to bid on this particular contract was mailed by NYQMPA and received by the plaintiff shortly after this visit.
11. Upon Mr. Myerson’s return, he conveyed the information he had gathered to plaintiff’s purchasing and production control departments and to its laboratory. Plaintiff thereupon began a study to determine whether it should bid on the disinfectant contract. Since all of the ingredients in the disinfectant, with the exception of chlormelamine, were well-known to plaintiff, its chemists concentrated their study on the characteristics of chlormelamine. Plaintiff’s chemists, who had had experience with chlorinated materials, knew that chlormelamine should be handled carefully and as gently as possible. Plaintiff obtained a five-pound sample of the required chlormelamine from Wallace & Tiernan. This sample was observed to be a fine, free-flowing powder. In addition, plaintiff’s chemists made a small batch of chlormelamine in their own laboratory, after a number of experiments. This batch was also a fine, free-flowing powder and met the specification requirements for chlormelamine. The technical literature concerning chlormelamine was examined by plaintiff. This included the existing patents covering the chemical, as well as other available literature. The technical information available was extremely sparse, but all of the descriptions of chlormelamine were to the effect that it was a fine and free-flowing powder. Shortly after it requested the chlormelamine sample from Wallace & Tiernan, plaintiff received a letter from Wallace & Tiernan advising it to expect a possible and variable loss or “shrinkage” of chlorine content in the chlormelamine during com *456 pounding, which might run as high as 12 percent, but this letter contained no other warnings or advice. The technical information available showed that the solubility of chlor-melamine decreased as it went from monochlormelamine to hexachlormelamine, with hexachlormelamine being virtually insoluble, and plaintiff was aware of that fact, although it had no reason to expect that chlormelamine received from Wallace & Tiernan would contain significant amounts of virtually insoluble ehlormelamines.
12. In the main the information set forth in finding 9 regarding production of the disinfectant was not available to-plaintiff. Neither plaintiff nor any of the other bidders directed any inquiries to Dr. Treichler or his office. Even if they had, such inquiries would have been unavailing since Army Regulations strictly prohibited Army personnel from providing information or rendering assistance to prospective-bidders in the preparation of bids. Plaintiff did not know that Economics Laboratory had participated in the development of the disinfectant. Although plaintiff did not make specific inquiry of Wallace & Tiernan seeking technical information regarding production of the disinfectant, such inquiry, as shown by the experience of at least one other bidder, would not have elicited any of the information set forth in finding 9, beyond the advice that chlormelamine had theretofore been produced only in a pilot plant, that it had a shrinkage factor (i.e., loss of chlorine strength) of 8 percent to 12 percent, and possibly that it presented tricky problems as to solubility. Wallace & Tiernan, moreover, was not familiar with the problems which might be encountered in the course of full-scale manufacturing of the disinfectant. Plaintiff did not make inquiries of the holder of the chlor-melamine patent, for Wallace & Tiernan was the sole manufacturer and licensor, and there is no evidence that the patentee would have been able to provide necessary information.
13. (a) Prior to bidding, plaintiff’s chemists studied Military Specification Disinfectant, Chlorine, Food Service, MIL-D-11309 (QMC), dated August 6, 1951, which contained' the following provisions:
2.2 Other publications. — The following publications,, *457 of the issue in effect on date of invitation for bids, unless otherwise stated, form a part of this specification.
U.S. PHARMACOPOEIA COMMITTEE PUBLICATION
Pharmacopoeia of The United States (Latest Edition)
tit * # * *
3. REQUIREMENTS
3.1 Preproduction sample approval. — Before production is commenced, unless otherwise specified in the contract or order, disinfectant, chlorine, food service, furnished under this specification, shall be a product which has been tested and has passed the preproduction tests specified in 4.4 and sub-paragraphs.
3.2 Composition and form. — Disinfectant, chlorine, food service, shall be a uniformly mixed powder or granular material, and shall conform to the composition shown in table I.
Table I. — Composition, disinfectant, chlorine, food service

Percent 6y weight

Ingredient Minimum Maximum

Chlormelamine_ 21.5 22. 5
Surface active material, technical_ 11.5 12.5
Citric acid anhydrous_ 51.0 55.0
Monosodium dihydrogen phosphate anhy-drous_ Remainder
3.2.1 Ohlormelamine. — The chlormelamine shall be of technical grade and shall conform to the following requirements:
3.2.1.1 Titrable chlorvne. — Titrable chlorine shall be not less than 89.0 percent nor more than 94.5 percent when tested as specified in 4.6.1.1.
3.2.1.2 Moisture content. — The moisture content shall not be greater than 0.5 percent when tested as specified in 4.6.1.2.
3.2.1.3 Color. — The color shall be white to light cream.
3.2.2 Surf ace active material. — * * *
s{; sfe 5j; sfe
3.2.2.3 Moisture content. — The moisture content shall not be greater than 3.0 percent when tested as specified in 4.0.2.3.
ifc # * sfc
3.2.3 Citric acid anhydrous. — * * *
3.2.3.1Moisture. — Moisture content shall not be greater than 0.3 percent when tested as specified in 4.6.3.1.
# * * # *
*458 3.2.4 Monosodium dihydrogen phosphate anhydrous. — * * *
* $1 * * ❖
3.2.4.2 Moisture content. — The moisture content shall not be greater than 2.0 percent when tested as specified in 4.6.4.2.
3.3 Finished product.—
3.3.1 Titrable chlorine. — The Titrable chlorine of the finished product shall be not less than 19.1 percent nor more than 21.3 percent when tested as specified in 4.6.5.1.
# & ❖ $ *
3.3.4 Solubility. — The finished product shall be readily soluble when tested as specified in 4.6.5.4.
3.3.5 Particle size. — Not less than 95 percent, by weight, of finished product shall pass through U.S. Standard Sieve No. 20, and not less than 100 percent, by weight, through a U.S. Standard Sieve No. 10, when tested as specified in 4.6.5.5.
* * * * *
3.5 Workmanship. — The finished product shall be clean, uniformly blended and free from defects which may impair its utility.
* * * * #
4.4.3 Surface tension. — Approximately 5 grams of the product shall be ground and mixed thoroughly in a glass mortar with a glass pestle. * * *.
$ $ * * «
5.1.1 Packaging.—
5.1.1.1 Not less than three and thirty-five hundredths (3.35) ounces of the product shall be packaged in a pouch constructed of material meeting requirements specified in 5.1.1.2, 5.1.1.3, 5.1.1.4 and 5.1.1.5. * * *.
'Í* *í* 't* ^ ¡|i
5.1.2.1.2 Liner requirements. — Each intermediate carton of twelve (12) pouches shall be wrapped in (or placed in a prefabricated bag made of) waterproof barrier material in conformance with Specification JAN-P-125, type C-1 or C-2. In addition, each shipping container shall be provided with a sealed case liner or prefabricated bag made of waterproof barrier material in conformance with Specification JAN-P-125, type L-2 or M. Closure and seams of intermediate carton wrap and case liner shall be completely sealed with a continuous seam of minimum '% inch width water resistant adhesive in conformance with Specification JAN-P-140.
*459 (b) All of the ingredients, except chlormelamine, were in 1951 known to be readily obtainable in the form of fine, free-flowing powders. In this form, the particle size of these chemicals would easily meet individually the particle size tests specified for the end product. The end-product also had to meet the solubility or rate of going into solution test.
14. Although the foregoing specifications do not purport to provide directions as to the method of manufacture, their provisions, coupled with (a) the lack of warning by the defendant and (b) the plaintiff’s experience in related undertakings, justified the plaintiff in concluding that performance of the contract involved familiar mixing techniques rather than grinding of the ingredients, and that mixing prescribed ingredients of the prescribed particle size in the prescribed quantities would produce an end product complying with the specification test for solubility.
15. As an additional part of its study and work in preparing its bid, plaintiff compounded several laboratory batches of the disinfectant (at first meeting some difficulties in synthesizing chlormelamine). It used in these batches of disinfectant both the chlormelamine obtained from Wallace & Tiernan and that successfully synthesized in its own laboratory. All the ingredients used, including the chlormelamine, met the requirements for ingredients contained in the military specification. The laboratory batches were compounded simply by placing the ingredients in a jar and mixing them by means of rolling the jar. The end product thus obtained was tested by plaintiff and found to satisfy fully all the tests and standards for the end product set forth in the military specification.
16. At the time that plaintiff was preparing its bid, the FR Corporation of New York City, a company skilled and experienced in the manufacture of chlorine disinfectants and which had previously produced such a disinfectant for the Quartermaster Corps, was also preparing to bid. After receiving its invitation, FR Corporation inquired of Wallace & Tiernan about chlormelamine and obtained a sample. This sample was a fine free-flowing powder. FR Corporation also received a letter from Wallace & Tiernan, in sub *460 stance, the same as the one received by plaintiff from that company in October 1951, warning about possible “shrinkage” in the chlorine content of chlormelamine (finding 11, supra). As did plaintiff, FR. Corporation made the disinfectant in the laboratory by simply mixing the required ingredients. The result was a mixture that met the end requirements of the specification. On the basis of this sample batch, its examination and study of the specification, and its experience in compounding disinfectants, FR Corporation concluded that this disinfectant could be produced by simply mixing the ingredients, despite the fact that it anticipated that chlormelamine solubility and shrinkage might create tricky problems for which a small contingency allowance was made in its bid.
17. The mixing process contemplated by both plaintiff and FR Corporation in figuring their bids involved the use of a closed drum into which the required ingredients, in the specified proportions, would be placed and mixed. After mixing, the disinfectant would be packaged as set out in the ■specification. It was contemplated that there would be no grinding of the chlormelamine or of any of the other ingredients at any stage of the process.
18. Plaintiff’s interpretation of the military specification to the effect that the disinfectant could be produced by simply mixing the required! ingredients, and that no grinding would be necessary, was a reasonable one under all the facts known to plaintiff at the time it prepared its bid. In studying the problem with respect to the method by which the disinfectant could be produced, plaintiff made a reasonable investigation to ascertain the pertinent facts, and all of the information it was able to obtain confirmed its analysis and interpretation of the specification. Defendant’s officials knew or should have known that such an interpretation of the specification could reasonably be made by bidders and, in withholding the information they had with respect to the necessity for grinding, they made it possible for bidders to be misled by the specification as to the process by which the disinfectant could be produced, and plaintiff was so misled.
19. Having reasonably concluded that the disinfectant *461 could be produced by simply mixing the four ingredients in powdered form, plaintiff prepared its bid accordingly. The invitation to bid called for unit prices both, f.o.b. origin and f.o.b. destination for each of the required shipments. Plaintiff’s average unit bid (i.e., per pouch) f.o.b. origin was $0.15449. The basis upon which plaintiff computed its bid is shown by the following schedule:

Chemicals

Chlormelamine_$0.05067
Surface active agent_ . 00754
Citric acid_ . 02996
Monosodium phosphate_ . 00211
Total chemicals___ . 09028

Packaging Material

C-l bag_ . 00146
Case liner_ .00154
Chipboard carton_ . 00208
Wood box_ . 00979
Pouch material_ .00369
Other materials_ . 00047
Make pouches (Dunes Products)[1]_ .00500
Total packaging material- . 02403 Scrag, etc.
Scrap on chemicals and packaging material— 2 percent_ . 00229
Shrinkage of chlormelamine — 10 percent (i.e., shrinkage in chlorine content)_ . 00507
Freight — pouches and chlormelamine [2]_ . 00100
Total scrap, etc- . 00836

Labor

Mixing - .00251
Packaging - . 00376
Total direct labor_ .00627
Prime cost_ .12894
Burden (factory overhead) — 80 percent of direct labor_ . 00502
Total manufacturing cost- . 13396
General and Administrative Píspense — 8 percent of total manufacturing cost_ .01072
Contingency_ . 01000
Total bid- [3].15468
*462 (a) In the bid chlormelamine was figured at a cost of $1.10 per pound, which is the price subsequently paid by plaintiff for the chlormelamine used by it in producing the disinfectant. The other figures for chemicals and materials were based on delivered price quotations. The items for labor were based on the wage rates then in effect and plaintiff’s experience in mixing powdered chemicals.
(b) In computing its f.o.b. destination prices, plaintiff simply added the necessary freight to its f.o.b. origin prices.
(c) The item for possible “shrinkage” of the chlorine content of chlormelamine was based on the letter from Wallace & Tieman mentioned in finding 11.
(d) Plaintiff planned to use one and a half shifts in producing the disinfectant, and its burden rate of 80 percent was based on its experience for a shift and one-half.
(e) The general and administrative expense rate was the usual one used by plaintiff for Government contracts and was based on its experience.
20. Plaintiff submitted its bid under date of October 25, 1951. A total of 11 companies, including Economics Laboratory, submitted bids prior to the bid opening on October 26th. Among these was the FE Corporation, which as has been stated, was a company skilled and experienced in the manufacture of chlorine disinfectants. The basis upon which the FE Corporation computed its bid per unit f.o.b. origin is shown by the following table:

Chemicals

Chlormelamine ($1.50 lb., plus 12 percent allowance for shrinkage of chlorine content)_$0. 07739
Surface active agent_ . 00729
Citric acid_ . 02942
Monosodium phosphate_ . 00226
Scrap allowance — 3 percent- .00349
Total chemicals_ . 11985
Packaging materials (including 3 percent scrap allowance) _ .02014
Labor_ . 01870
Total manufacturing cost- . 15869
Profit — 15 percent_ . 02380
Contingency_ . 01000
Total bid_ . 19249
If, as in plaintiff’s bid, chlormelamine had been computed in the FE Corporation’s bid at $1.10 per pound and no pro *463 vision had been made for profit, the total unit bid would have been $0.14734.
21. Plaintiff’s bid proved to be the lowest submitted. Based on its reasonable belief that only a simple mixing process was required, with no grinding, and since it made no provision for profit, plaintiff’s bid was a reasonable one. On October 30, 1951, the equipment that plaintiff planned to use to produce the disinfectant was surveyed by Government inspectors and found to be satisfactory. Among other things, these inspectors reported as follows:
32. Discuss Machinery and Equipment on Hand (Condition as a whole, adequacy, additional machinery necessary, etc.)
Complete mixing, bottleing [sic] & Packaging machinery. Machine shop to build and maintain equipment and to manufacture Beauty Shop equipment. Complete tool room.
* * * * *
42. Bemarks and Additional Information: (Do you think this supplier can and will fulfill his obligations under this bid or contract? If not, explain.)
Mixing of ingredients for item would be done Porcelain lined tanks with Porcelain Baffles, (Burton Dry Mixer). Material from mixer to packaging via stainless steel tubing. _ Direct to packaging without coming in contact with air. Packaging according to specifications.
On November 8, 1951, the disinfectant contract (QM-21251), hereinafter referred to as the “first” contract, was awarded to plaintiff. All of the prices set out in the contract were f.o.b. origin.
22. The initial shipments under the first contract were due to be made in February 1952. On December 12, 1951, NYQMPA issued 125 invitations to bid (Invitation No. QM-30-280-52-765) on a second supply contract for 3,309,-000 pouches of disinfectant, chlorine, food service (hereinafter referred to as the “second” contract). The specification for the disinfectant was substantially and in all material respects the same as for the first contract. The delivery schedule set out in the invitation was as follows:
550,000 packages during May 1952
550,000 packages during June 1952
550,000 packages during July 1952
*464 550,000 packages during August 1952
550,000 packages during September 1952
559,000 packages during October 1952
Bidders were warned that they must not “deviate from the proportionate monthly requirements stated herein * * The opening date for the bids was stated to be January 17, 1952. Plaintiff received one of these invitations and undertook to prepare a bid on this contract.
23. On December 21, 1951, Wallace & Tiernan wrote to plaintiff advising it of a shipment of chlormelamine. This letter also contained the following statement:
There are two items in connection with this material which we want to call to your attention. Trichloro-melamine should not be exposed to excessive heat as this may cause decomposition. At temperatures between 250 and 350° F., the material undergoes decomposition and produces a large quantity of smoke. This can easily be demonstrated by igniting 5 grams of it in the Laboratory under a hood. Consequently, it should be stored away from steam pipes. The smoke given off is unpleasant and may be toxic and fires once started in a drum of material are difficult to extinguish because of the large amounts of smoke and fumes that are generated.
We further wish to caution you against grinding or mixing the pure material by itself since a build up of heat from friction can ignite it. The proper procedure when mixing is to add the Trichloromelamine last. This material has been examined by the Bureau of Explosives of the Interstate Commerce Commission and has been passed for shipment without requiring any type of special labelling. However, in spite of this, we wish to point out that the material should be handled with care and that it is very important not to subject it to high temperatures. I would appreciate it if you would bring this to the attention of your Research and Production Departments immediately.
The plaintiff did not interpret this letter to mean that grinding of the chlormelamine was necessary in order to produce the disinfectant.
24. On January 11, 1952, plaintiff produced a 175-pound batch of the disinfectant by a simple mixing process. On January 24th, a 1,000-pound or production-size batch was also produced using only a simple mixing process to com *465 pound the ingredients. Both of these batches of the finished product satisfied all the requirements set forth in the military specification.
25. In preparing its bid on the second disinfectant contract, plaintiff, relying on the information it had acquired prior to bidding on the first contract and on its brief intervening experience in producing the disinfectant, as previously mentioned, still believed that only a simple mixing process would be required. As in the first bid, plaintiff made no provision for profit. Plaintiff hoped that, if it should be awarded the second contract, it could achieve substantial manufacturing and purchasing economies by reason of the great increase in the number of miits to be produced. Plaintiff planned to •use two shifts and to produce the disinfectant for the two contracts more or less simultaneously in order to reduce its manufacturing costs. In addition, it believed that the cost of materials could be reduced by approximately 10 to 15 percent due to the greatly increased volume of purchases. Its average unit bid f.o.b. origin on the second contract was $0.13290, or about 14 percent lower than the unit bid on the first contract. The basis upon which this bid was computed is shown by the following table:

Chemicals

Chlormelamine ($1.10 lb.)_$0.05067
Surface active agent_ . 00647
Citric acid_ . 08024
Monosodium phosphate_ . 00230
Total chemicals_ . 08968
Packaging material =====
0-1 bag_ . 00171
Case liner_ . 00140
Chipboard carton_ . 00163
Wood box_ . 00865
Pouch material_ • 00708
Other materials_ . 00075
Total packaging material_ . 02122
Scrap, etc. =====
Scrap on chemicals and packaging material— . 00232
Shrinkage of chlormelamine (chlorine content) — 10 percent- . 00506
Unexplained difference[1]_ . 00028
Total scrap, etc_ . 00766

*466
Labor

Mixing_ O to
Packaging_ O G»
Total direct labor-O CO
Prime cost (chemicals materals and labor) M -q
.00512 Burden (factory overhead) — 60 percent of labor-
Total manufacturing cost_ [2].13221
The f.o.b. destination figures called for in the bid were arrived at by adding the required freight to the f.o.b. origin figures.
26. Plaintiff submitted its bid on the second contract immediately prior to the bid opening on January 17, 1952. As already stated, invitations had been issued to 125 companies, a total of 10 companies submitted bids, including Economics Laboratory. Plaintiff again proved to be the low bidder. In light of plaintiff’s belief that only a simple mixing process was required and its belief that substantial cost savings could be achieved by reason of the greatly increased quantities to be produced, plaintiff’s bid was a reasonable one at that time. The anticipated savings through bulk purchases of materials were not actually realized, because price reductions were contingent on firm delivery schedules to the suppliers, and the delays and difficulties experienced in production precluded plaintiff from giving firm delivery schedules to its prospective suppliers. Normally quantity discounts are common in connection with procurement of materials.
27. As already mentioned, Economics Laboratory submitted a bid on each of the two disinfectant contracts.[7] At the time when bids on the second contract were being submitted, Dr. Wilson, in a letter dated January 11,1952, wrote to the purchasing officer in charge of procurement of the disinfectant and stated in part:
We, of Economics Laboratory, Inc., St. Paul, Minnesota, feel that the following points should be reviewed by the Purchasing Officer and taken into consideration when awarding the Contract covering the invitation *467 referred to above [Invitation No. QM-30-280-52-765].
1. Economics Laboratory, Inc. has engaged in Research and Development covering the applicable specification from 1946 to date. The product is basically our formulation. The findings of this research were contributed to the Quartermaster to be used in drawing up the applicable specification.
2. Economics Laboratory, Inc. has previously engaged in pilot plant production of this material and has had complete experience in its production. This experience has shown that this production is tricky and dangerous and this production experience is found to be a necessity in producing a satisfactory product.
ifi ‡ # ifi
In view of the above, Economics Laboratory, Inc. recommends that the Purchasing Officer carefully examine the qualifications, experience and reputation of the low bidder under this invitation before making the award.
As hereinafter shown, the award of this second contract was not made until April 1952, at which time it was awarded to plaintiff.
28. Plaintiff commenced production of the disinfectant in late January of 1952. As already stated, it produced a 1,000-pound batch on January 24th. During all pertinent periods it purchased chlormelamine from Wallace & Tiernan. Plaintiff’s purchase orders specified that the chlormelamine must satisfy the standards for that ingredient set forth in the military specification. Chlormelamine received from Wallace & Tiernan was tested in plaintiff’s laboratory upon arrival, and shipments which did not meet the specification requirements were rejected. At all pertinent times the chlormelamine used by plaintiff satisfied the specification requirements for that ingredient. The other ingredients used by plaintiff in producing the disinfectant were likewise tested by it when received from the suppliers, and all of these ingredients so used met the standards contained in the military specification.
29. (a) After successfully producing a 1,000-pound batch of the disinfectant by a simple mixing process on January 24, 1952, plaintiff produced five 1,000-pound batches using the same process. All five of these batches failed to meet the solubility test set forth in the military specification and had *468 to be rejected. The major reason for these failures was that the particle size of the chlormelamine was too large to permit dissolution within the required time. The particle size was, however, small enough to satisfy the particle size specifications for the finished product, and the chlormelamine met all the specification requirements for that ingredient.
(b) Plaintiff’s chemists engaged in considerable study and experimentation in seeking to solve this problem. By early March of 1952, plaintiff had determined that in order to meet the solubility test it would have to grind the chlormela-mine in order to reduce its particle size.
30. On March 7, 1952, a fire occurred in one of the detached buildings of plaintiff’s plant. The origin of this fire was unrelated to production of the disinfectant, but it destroyed certain space and equipment which plaintiff had planned to use in production of the disinfectant. From March 7 until late August 1952 plaintiff conducted its disinfectant production in temporary shedlike quarters consisting largely of a roof with tarpaulins for walls. This provisional arrangement made it more difficult to maintain adequate moisture controls due to exposure to the weather. The effect of humidity on mixing and grinding anhydrous powders is described in finding 36, mfra.
31. (a) From early March until about March 20, 1952, plaintiff produced a series of experimental batches of disinfectant. Having determined that grinding was necessary, plaintiff was seeking at this time to develop a manufacturing technique that would result in a satisfactory product. One of the problems caused by grinding the ingredients was that the material became too fluffy and the quantity by weight required by the specifications would not fit in the pouch in which it was to be packaged. After intensive study and experimentation, plaintiff, on about March 20th, developed the so-called “60 percent mix” process. This technique appeared to result in a satisfactory end product and to solve the solubility problem. It also solved the fluffiness problem caused by grinding.
(b) The “60 percent mix” technique developed by plaintiff was as follows:
All of the chlormelamine, monosodium phosphate and *469 •“wetting agent” and about 25 percent of the citric acid were mixed in a preliminary mix or “pre-mix”. This pre-mix was then put through a grinding machine. After being ground and then weighed, the material was transferred to á mixer and the remainder of the citric acid was added. The ground material and the added citric acid were then mixed in order to produce the final product, which after being thus mixed, was transported to the “filling line” for packaging. The reason for not grinding all of the required ingredients was to prevent overfilling of the pouches. This technique involved three separate processes, as contrasted with the simple mixing process originally contemplated by plaintiff, which would have required only a single mix and no grinding.
32. On March 19, 1952, when plaintiff had already determined that grinding was necessary and was developing a manufacturing technique, there was a conference at plaintiff’s plant attended by Major Anninos and Mr. Martin of NYQMPA, David Crampton, who was Superintendent of Chemical Manufacturing at Wallace & Tiernan, and a number of plaintiff’s technical and production personnel. The production difficulties being experienced by plaintiff were discussed and considered. During the course of this meeting, Mr. Martin said that pressure was being put upon NYQMPA to award the second contract to Economics Laboratory. In their report of this meeting, Major Anninos and Mr. Martin stated in part:
This is the first time this item has been produced in volume and OQMG [Office of the Quartermaster General] has advised that there is an urgent need in the field for such disinfectant to reduce the incidence of dysentery.
33. About this time, probably in early April of 1952, Mr. Martin, Mr. Myerson and Stephen A. Hunter, Mr. Myer-son’s assistant, who was supervising the production of the disinfectant, discussed the disinfectant contract in the offices of NYQMPA. In the course of this discussion, Mr. Martin said that he had communicated with his superior in Washington and advised him in effect that, in his opinion, the disinfectant contract should not have been let out on competi- *470 five bids as a regular supply contract but, instead, should have been negotiated so as to encourage several manufacturers to be available for emergency requirements. Mr. Martin made similar statements to Mr. Myerson on several other subsequent occasions. Major Armiños had requested authority to negotiate the second contract, but the request was refused.
34. After developing the “60 percent mix” technique, plaintiff manufactured a number of successful batches, although it still experienced occasional solubility failures. In addition, in early April 1952, a series of fires occurred in the production of the disinfectant. It was discovered that if even a minute amount of grease from hot bearing surfaces of the mixer or grinder came into contact with the chlor-melamine a fire might occur. On April 8th a serious fire took place which destroyed virtually all of the material from previously rejected batches, which were in the vicinity of the fire. The need for grinding was a contributing cause of these fires, since grinding imparted heat to the chlor-melamine and increased the amount of dust floating in the air which coated the bearings of the machines, causing them to heat up through the added friction. Plaintiff experimented with numerous types of mixing and grinding equips ment in an attempt to solve this problem.
35. (a) The necessity of grinding led to other production problems. Thus, the grinding operation resulted in a vast amount of dust. By reason of the grinding, the number and fineness of particles were increased and considerable energy was applied to these particles, especially in transporting the powder from the grinders to the mixers by blowers, all of which made it more difficult to contain the particles and caused them to escape into the air. The materials lost to dust were, of course, wasted, and a serious-health hazard was created. In a simple mixing operation, such as plaintiff originally contemplated, the dust problem would have been substantially less.
(b) The large amounts of dust seriously affected the health of many of plaintiff’s employees, with a consequent adverse effect upon production and expenses. Complaints of nose bleeds, coughing, throat irritations and the like were *471 widespread. An Army doctor who investigated this problem late in 1952 concluded in part:
Disseminations of dust into the air from the mixing and grinding of Disinfectant, Chlorine, Food Service, results in chemical irritation of the respiratory tract of the exposed individual.
% sfc sjt %
Escape of dust into the air during the mixing and grinding of the compound occurs at a number of points in the sequence of the operations as performed at this [plaintiff’s] plant. This dust contaminates the air both at the time it escapes and whenever it is disturbed after it has settled out on objects and surfaces of the room.
The health hazards incident to a simple mixing operation would have been substantially less.
36. The necessity of grinding made it more difficult for plaintiff to keep the materials free of excessive moisture. In plaintiff’s grinding operation the materials were conveyed to the adjoining mixer by an air blower. The subdivision of the particles by grinding exposed a greater surface to the air then if the materials had not been ground. Upon exposure to the air, the water dispersable, anhydrous materials in the disinfectant would readily absorb moisture present in the air. During the period that manufacturing operations were conducted in the temporary quarters previously mentioned, plaintiff was unable to produce the disinfectant if the amount of humidity in the atmosphere was excessive. However, in a simple mixing operation of the type that plaintiff anticipated, where only a single process is involved, there would have been little difficulty in keeping the materials free of undue moisture, except during the period of production in temporary quarters exposed to the weather. In short, grinding aggravated the inherent propensities of the ingredients to absorb moisture.
37. On April 17, 1952, a conference was held at plaintiff’s plant attended by Dr. Treichler, Major Anninos, Mr. Cramp-ton of Wallace & Tiernan and a number of plaintiff’s officials. The purpose of the meeting was to investigate and discuss the production difficulties, especially the fires, that plaintiff had encountered. Major Anninos was also seeking to determine whether the second contract should be awarded *472 to plaintiff. Dr. Treichler and Mr. Crampton inspected plaintiff’s facilities and made a number of suggestions. Dr. Treichler directed plaintiff not to produce the disinfectant when the humidity in the air exceeded 45 percent at 80° F., and was dissatisfied with the lack of moisture control in the temporary quarters. After considerable discussion the consensus was that plaintiff was proceeding satisfactorily and would be able shortly to resolve its production problems. Major Armiños advised Mr. Myerson informally that plaintiff would be awarded the second contract. In his report of the meeting, Major Anninos stated in part:
As a result of this visit, both Dr. Treichler and the undersigned feel that contractor can perform satisfactorily on the current contract and is capable of taking on an additional contract for 3,309,000 packages.
38. The bids on the second contract were to be opened on January 17, 1952, and an award made within 30 days, but plaintiff on February 4 gave defendant an extension of time of 60 days to make the award. During this extension period, plaintiff learned of the need for grinding and became aware of the extra costs involved as a result of the need for grinding. Plaintiff contemplated withdrawing its bid because of the knowledge of grinding and extra expenses necessarily to be incurred. Notwithstanding this knowledge, plaintiff, on April 18, granted defendant an additional 15-day extension of time to make the award. Plaintiff was awarded the second contract (QM-26452) on April 23, 1952.
39. It has been found (finding 26, supra) that plaintiff’s bid on the second contract immediately prior to bid opening on January 17, Í952, was reasonable under the circumstances which existed and were known to plaintiff at that time. On or about April 18, when the plaintiff held its bid open to the defendant for an additional 15 days, the plaintiff had it within its power to withdraw from the second contract commitment, but did not do so. By April 18, 1952, the plaintiff had become aware of the need for grinding and of the presence of production problems which it had not been able to anticipate at the times it bid on either the first or second •contracts. Plaintiff thought it had diagnosed and solved its manufacturing difficulties by that time but was not yet aware *473 of the problem whose cause was discovered in December 1952 as related in finding 47, infra.
40. On or about April 28, 1952, a procurement directive was issued by the Quartermaster General directing an additional procurement of 154,000 packages of the disinfectant. This directive provided in part:
The following additional comments are made on subject specification:
# # Jfc }fs
Par. 3.5 Workmanship. — Add the following: “The entire process of mixing, grinding, filling and sealing of the individual pouches shall be carried out in surroundings held at a relative humidity of not more than 45% at 80° F. and in such a manner as to insure a product of consistently high quality. Both components and bulk mixed finished formulation shall be packaged in moisture vapor proof containers and kept dry and protected from moisture until incorporated into the final packaging. See Note 6.4.”
* * ❖ ❖ ❖
Add the following:
Note 6..If.. — This item is intimately related to troop health in the field; extreme care must be exercised in handling, grinding,_ mixing and packaging the components and formulation to protect against moisture and to insure homogeniety of the formulation so that a consistently high quality product will be produced which will remain stable during long time storage. All equipment should be kept clean and protected against moisture during any shutdown. During a shutdown of more than 12 hours, it is recommended that all adhering formulation.be removed from the grinding, mixing and filling machines. Care must be exercised in mixing and grinding trichlormelamine because this component concentrated or mixed.with only monosodium dihydrogen phosphate may . be ignited by. sparks or heat generated by unsuitable mixing or grinding equipment.
It is further recommended that the following be made part of the invitation to bid.
“1. . At the time of submission to bid, the bidder shall submit a complete description of the proposed method of manufacture together with a detailed list of the specialized equipment, humidity control facilities, and chemical control laboratory facilities in his plant ready *474 for utilization in the manufacture of the superior quality product required.
“2. Twenty-four bid samples shall be submitted to the contracting officer at the time of submitting bid together with supporting laboratory data and certification that samples and components submitted conform to the requirements of the subject specification, in addition to any other exceptions on the invitation to bid.
“Note: ‘Bidder’s attention is directed to the fact that this item is both difficult to produce and requires specialized equipment and technical know-how based on past experience to produce the superior product required. It is further pointed out that this particular item is an emergency health protection item used by field troops to prevent their contracting disease; under emergency conditions this item constitutes their sole protection and must be relied upon at all times for this purpose.’ ”
The quoted material was set out in largely unaltered form in the invitation to bid for this procurement issued on May 9, 1952.
41. By May 8, 1952, a draft of a revised military specification for the disinfectant had been prepared. Incorporated in this draft were provisions largely the same as those set forth in the preceding finding. On February 27, 1953, the revised specification (MIL-D-11309A) was formally issued, superseding the specification of August 6,1951. The revised specification provided in pertinent part as follows:
3.5 Worlcmamhif. — The finished product shall be clean, uniformly blended and free from defects which may impair its utility. The entire process of mixing, grinding, filling and sealing of the individual pouches shall be carried out in surroundings held at a relative humidity of not more than 45 percent at 80° F. and in such a manner as to insure a product of consistently high quality. Both components and bulk mixed finished formulation shall be packaged in moisture vapor proof containers and kept dry and protected from moisture until incorporated into the final packaging. (See 6.4.) # $ $ $ *
6.4 Extreme care must be exercised in handling, grinding, mixing and packaging the components and formulation to protect against moisture and to insure homogeneity of the formulation so that a consistently high quality product will be produced which will remain stable during long time storage. All equipment *475 should be kept clean and protected against moisture during any shutdown. During a shutdown of more than 12 hours, it is recommended that all adhering formulation be removed from the grinding, mixing and filling machines.
6.5 Bidder’s attention is directed to the fact that this item is most difficult to produce and requires specialized equipment and technical know-how based on past experience to produce the superior product required. It is further pointed out that this particular item is an emergency health protection item used by field troops to prevent their contracting disease. Under emergency conditions this item constitutes their sole protection and must be relied upon at all times for this purpose. There can be no compromise or deviation from the high quality and stability standards set for this product.
6.6 Grinding. — In order to meet solubility requirements it is necessary to grind at least a portion of the finished formulation and all of the trichlormelamine and wetting agent in micronizing equipment. Trichlormel-amine must not be ground alone or when mixed only with the monosodium dihydrogen phosphate.
42. Following the meeting of April 17, 1952, plaintiff’s production of the disinfectant continued to be erratic. Fires or smoldering caused the loss of several batches, and plaintiff continued its search for satisfactory equipment. Other batches had to be rejected because of solubility failures or because the chlorine content of the product was either too high or too low. The solubility failures continued even though plaintiff was grinding the chlormelamine. And the high and low chlorine failures occurred despite the fact that it was plaintiff’s practice to take a sample from each batch of chlormelamine as delivered from Wallace & Tieman, compute the chlorine content to insure that it met the specification requirement, and then compound the ingredients in the proportions set out in the specification. In May 1952 plaintiff suspected that a possible cause of its difficulties was lack of uniformity in the batches of chlormelamine being delivered from Wallace & Tieman, even though they were tested and met specifications.
43. In late August 1952, production of the disinfectant was moved from the temporary quarters to a permanent air-conditioned building which plaintiff had constructed follow *476 ing the March 7th fire. Humidity in the new building was subject to strict control. In addition, plaintiff had by this time acquired mixing and grinding equipment in which the bearing surfaces were so protected as to avoid starting fires such as plaintiff had experienced earlier. The preliminary mix (or pre-mix), which contained all the chlormelamine and 60 percent of the total material (see finding 31), was mixed in a Marion mixer. The pre-mix then flowed into a grinder called a Prater mill. From the grinder the material was fed into the final mixer, a V-shaped machine called a Patterson-Kelly mixer, into which the remainder of the citric acid had already been loaded. The materials were given a gentle but thorough mix in the Patterson-Kelly mixer, and the end product was thus obtained. The disinfectant was then placed in sealed drums and taken to the packaging department, which was in plaintiff’s main building. Plaintiff continued to use these facilities and to follow the manufacturing technique described until the completion of production on the two disinfectant contracts.
44. Even after production of the disinfectant was moved into permanent airconditioned quarters, erratic results continued. Batches continued to be rejected both because of poor solubility and too high or too low chlorine content. Plaintiff intensified its investigation and experimentation aimed at discovering the cause of these failures. It tried grinding the materials twice instead of once in order to meet the solubility test. The resident Government inspector stated in a report dated September 12, 1952, that plaintiff “has endeavored with all facilities available and sparing no expense to find the solution to the difficulties encountered.” In another portion of his report the inspector recommended to his superiors the following “corrective action”:
. Advise Research and Development Office that further development on a production level is necessary. All possible information on the physical and chemical characteristics of Trichlormelamine should be made available to the contractor, with particular stress on solubility at various concentrations.
45. (a) In an effort to solve the problem of erratic production results, plaintiff, in September 1952, altered its method of testing the chlorine content of the . chlormelamine *477 received from Wallace & Tieman. Chlormelamine was customarily shipped to plaintiff in lots of 1,000 pounds and was packed in fiber drums containing 100-125 pounds of chlor-melamine each. Prior to September 1952, it was plaintiff’s practice to determine the square root of the number of drums received in the shipment and then to take a sample from each of that number of drums. For example, if there were nine drums in the shipment, samples were removed from three. The samples taken were then mixed together, and the composite sample was tested for the required chlorine content. This method of sampling was customary in the industry and was a reasonable one.
(b) Beginning in September 1952, plaintiff, suspecting that the chlormelamine being sent to it by Wallace & Tier-nan might not be uniform in chlorine content, began to sample and test each individual drum of chlormelamine received. Plaintiff found that, although the chlormelamine met the chlorine-content requirement in the military specification (otherwise, the shipment was rejected), there were variations in chlorine content between individual drums in the same shipment. Plaintiff used the information obtained from testing individual drums in determining the amount of chlormelamine to be incorporated in each batch of the disinfectant. If the tests showed the chlorine content to be on the low side of the limits in the specification, then a little more chlormelamine was used, if on the high side, then a little less chlormelamine was included in the batch. This practice decreased the number of failures in plaintiff’s production of the disinfectant.
46. By November 1952, production of disinfectant had improved to the point where the resident Government inspector could make the following statements in his report:
All causes which contributed directly or indirectly to the existing delinquency have been resolved and removed. They were in brief:
1. Inability to produce product to meet Spec [military specification] due to nature of material itself.
2. Contractor had to spend more time in Besearch and Development than in production.
3. Packaging and packing materials did not prove adequate for purpose they were intended.
*478 All the above problems have been resolved through close cooperation of Kesearch and Development Office, the Food Container Institute, and NYQMPA with the Contractor. It is expected that production will proceed uninterrupted for the duration of the contract.
Even so, plaintiff still continued to experience failures in its. production of the disinfectant.
47. In December 1952 plaintiff discovered that Wallace & Tieman was not shipping individual batches of chlor-melamine to plaintiff as they were manufactured but instead was blending several batches together and shipping the blended chlormelamine. Upon this discovery, plaintiff asked that Wallace & Tieman send a shipment of unblended batches to it, which was done. Plaintiff found each un-blended batch to be consistent and uniform in all its characteristics but observed that there were variations in chlorine content and appearance between different batches. Plaintiff then requested that Wallace & Tiernan send unblended chlormelamine exclusively. In March 1953 after the stock of blended chlormelamine had been exhausted, plaintiff began to receive unblended chlormelamine. Although each unblended batch was uniform and met the specification requirements, significant and obvious differences between different batches were noted. Thus, chlormelamine from one batch might be dense and heavy, from another batch it might be light and fluffy. One hundred pounds of chlormelamine from one batch might fill an entire dram, while one hundred pounds from another batch might fill less than half of the dram. However, since each batch was uniform, plaintiff was able to obtain accurate knowledge of its chlorine content and other characteristics and to use this knowledge in compounding the disinfectant. From the time that it commenced receiving unblended batches of chlormelamine, plaintiff’s production continued uninterrupted throughout the remainder of the two disinfectant contracts, and only a negligible number of failures was experienced.
. 48. (a) The number of disinfectant packages produced by plaintiff and accepted by the Government on the first disinfectant contract is shown by the following table:

*479
Amount produced and accepted to date

1952 Packages

April 3_ 146,400
May 3_ 146,400
May 23_ 317, 088
June 6_ 394, 480
June 20_ 500,256
July 3_ 549, 024
July 18_ 604,800
August 15_ 642, 908
August 29_ 642, 908
September 12_ 674, 300
September 26_ 716,446
October 10_ 716, 446
October 24_ 716,446
November 7_ 890, 688
November 21_ 986, 688
December 5_ 1,178, 688
December 19_ 1,418, 880

1955

January 2_ 1, 562, 880
January 16_ 1, 706, 880
January 30_ 1, 867, 968
February 13_ 2, 051, 768
The first contract was completed in late February 1953. The total number of packages shipped by plaintiff and accepted by the Government on this contract was 2,252,472, and plaintiff has been paid the contract price therefor.
(b) The number of disinfectant packages produced by plaintiff and accepted by the Government on the second disinfectant contract is shown by the following table:

Amount produced and accepted to date

1955 Package»

February 27_ 147,936
March 13_ 429, 984
March 27_ 709,824
April 10_ 910,272
April 24_ 1,030,272
May 8_ 1,210,272
May 22_ 1,533,216
June 12_ 1,970,496
June 26_ 2, 293, 824
July 10_ 2, 551, 584
July 24_ 2,831,808
August 14_ 2, 831,808
September 1_. 2,993,332
September 11. 3,309,888
The second contract was completed about the middle of September 1953. The total number of packages shipped by plaintiff and accepted by the Government on the second con *480 tract was 3,332,544, and plaintiff has been paid the contract price therefor.
49. The military specification of August 6, 1951, did not disclose that the disinfectant had never before been mass-produced, but this the plaintiff knew or should have known before bidding. Nor did it reveal that extreme care was necessary in handling the materials and that specialized equipment would be needed, a fact which plaintiff did not know prior to bidding on the first contract, but did know in time to avoid commiting itself under the second contract. There was no disclosure that grinding of at least a portion of the materials, including all of the chlormela-mine, was required in order to meet the solubility test, but here again the plaintiff acquired this information in time to avoid its commitment to the second contract. Finally, the specification did not disclose that the only available chlor-melamine, which was the principal ingredient, was not uniform in quality from batch to batch and that chlormelamine which met the specification requirements might still contain significant amounts of relatively insoluble chlormelamines. All of this information was known, or should have been known, to defendant at the time it issued the specification, except that the defendant had no knowledge, actual or imputed, of the production methods of Wallace & Tieman in preparing chlormelamine for shipment, as described in finding 47, or its effect on plaintiff’s production of the disinfectant.
50. By reason of defendant’s omission from the military specification of significant and pertinent information known to it, with respect to the need for grinding, the specification as issued was misleading. As previously stated, defendant knew or should have known that the specification was subject to the reasonable interpretation that only a simple mixing process was required. Due to this misleading character of the specification, plaintiff was induced to submit bids on the first of the two disinfectant contracts in the mistaken but reasonable belief that only a simple mixing operation was called for. Plaintiff’s bid on the first contract was thus much lower than if it had known that grinding was necessary to produce the disinfectant.
*481 51. The basis upon which plaintiff computed its bids per unit is shown by findings 19 and 25. Translated into total dollar figures plaintiff’s two bids are shown by the following table:

Chemicals First bid (2,251,000 units) Second bid (S,309,000 units)

Chlormelamine ($1.10 lb.)_ $114,058.17 $167,667.03
Surface active agent_ 16, 972.54 21,409.23
Citric acid_ 67,439. 96 100, 064.16
Monosodium Phosphate_ 4,749. 61 7,610. 70
Total chemicals_ 203,220.28 296, 751.12

Packaging Material

C-l bag-3, 286.46 5,658.39
Case liner_ 3, 466. 54 632.60
Chipboard carton-4, 682. 08 5,393. 67
Wood box_ 22, 037.29 28, 622.55
Pouch material_ 8,306.19 23,427. 72
Other materials_ 1, 057.97 2,481. 75
Mate pouches (Dunes Products)[1]_ 11,255,00
Total packaging material-54, 091. 53 70,216.98
Scrap, etc.
Scrap on chemicals and packaging material — 2 percent_ 5,154. 79 7,676. 88
Shrinkage of chlormelamine— 10 percent (i.e., shrinkage in chlorine content)_ 11,412. 57
Freight-pouches and chlormela-mine [2]_:_•_ 2,251. 00 _
Unexplained difference[3]_ _ 926.52
Total scrap, etc. 18, 816.36 25,346.94

Labor

Mixing _ 5,650.01 8,305.59
Packaging _ 8,463. 76 19, 920.18
Total direct labor_ 14,113.77 28,225.77
Prime cost (chemicals materials and labor)_ 290,243.94 420,540.81
Buréen (factory overhead) [4]_ 11,300.02 16, 942.08
Total manufacturing cost_ 301,543.96 437,482.89
*482 „ „ „ First bid Second l>id General and Administrative Ex- (2,251,000 (s,soo,ooo pense — 8 percent of total manu- units) units) facturing cost_ $24,180.72 -
Contingency_ 22,510.00 _
Total bid_ 348,184.68 437,483.89
Total bid (f.o.b. origin) as submitted[5]_ 347, 759. 43 439, 682. 40
52. (a) The costs sustained by plaintiff in fulfilling the first disinfectant contract are shown in the following table:

Cost per unit Total cost

[1]

Chemicals_ $0.10221 $230, 074. 44
Packaging Materials- . 02065 46,479.04
Labor_ . 03144 70,771.44
Prime cost (chemicals materials and labor)_ . 15430 347,324.92
Burden (factory overhead)_ .03130 70,465.94
Total manufacturing cost_ . 18560 417,790. 86
General and Administrative Expense _ .01485 33,423.27
Total cost_ .20045 451,214.13
(b) Plaintiff’s costs on the first contract exceeded the amount of its bid by $103,454.70. After deducting the amount of plaintiff’s “C-l bag claim”, which is set forth separately (see findings 54r-69), and of the “pouch material claim”, which plaintiff has abandoned (see finding 70), the amount by which plaintiff’s costs exceeded its bid is $90,473.05. This is the pertinent measure of its loss in performing the first contract, exclusive of the C-l bag claim.
(c) The causes of the plaintiff’s losses in performing the first contract have been related in previous findings. While these losses were largely attributable to causes for which the defendant was at fault, it is also apparent that, even after the plaintiff developed its 60 percent mix technique and acquired its new equipment and facilities, it still experienced difficulties which it is assumed would have occurred even if it had started out with suitable equipment, facilities, and knowledge of the need for grinding. These *483 additional difficulties were directly caused by the fact, discovered by plaintiff in December 1952, that Wallace & Tiernan had been mixing its batches of chlormelamine before packaging and delivering them to plaintiff, instead of delivering to plaintiff unmixed batches of chlormelamine (see finding 47). Upon this being discovered it was shortly thereafter corrected and production proceeded smoothly and without interruption. Plaintiff has not proved that defendant is responsible for the loss occasioned by Wallace & Tiernan’s blending of the chlormelamine. Of the $90,473.05 which the plaintiff lost in performing the first contract, it is reasonable to assume that one-third would be attributable to the failure of Wallace & Tiernan to provide the plaintiff with unblended batches of chlormelamine.[8] Had Wallace & Tiernan done this from the outset the plaintiff would still have faced many of the problems and expenses it experienced in devising a successful mass production technique involving the unanticipated need for grinding and specialized equipment.
53. (a) The Costs sustained by plaintiff in fulfilling the second disinfectant contract are shown in the following table:

Oost per unit Total cost

[1]

Chemicals_ $0.10097 $334,109.73
Packaging Materials_ . 01987 65, 749. 83
Labor_ . 01664 55, 061. 76.
Prime cost (chemicals, packaging materials and labor)_ . 13748 454,921.32
Burden (factory overhead)- .01324 43,811.16
Total manufacturing cost_ . 15072 498, 732.48
General and Administrative Ex-pense_ . 01206 39, 906. 54
Total cost_ .16278 538,639.02
(b) The amount by which plaintiff’s costs on the second contract exceeded its bid is $98,956.62.
*484 (c) At the time of being awarded the second contract the plaintiff was by then aware of those technical facts concerning production difficulties which the defendant knew or should have known and as to which the specifications were silent, but neither the plaintiff nor the defendant was aware of the practice of Wallace & Tieman in delivering mixed batches of chlormelamine nor of its contribution to plaintiff’s production difficulties. Plaintiff has not proved that defendant is responsible for the loss occasioned by Wallace & Tieman’s blending of the chlormelamine.
54. The disinfectant specification (par. 5.1.2.1.2) provides in part that “[e]ach intermediate carton of twelve (12) pouches shall be wrapped in (or placed in a prefabricated bag made of) water-proof barrier material in conformance with Specification JAN-P-125, type C-1 or C-2.” For shipment, 8 of these intermediate cartons were placed in a sealed “case liner”, which in turn was placed in a wooden box. This box was then banded or strapped.
55. Plaintiff purchased large quantities of 0-1 bags from Central States Paper and Bag Company. As to all these bags, Central States furnished plaintiff with affidavits to the effect that the bags met the requirements of JAN-P-125. The bags were also approved and accepted by the Philadelphia QM General Testing Laboratory. This Laboratory performed all the tests on C-1 bags, and the Government inspector at plaintiff’s plant was not required to inspect C-1 bags unless specifically instructed to do so. Until the latter part of September 1952, plaintiff used these C-1 bags in connection with its production and shipment of the disinfectant and such use was approved by the Government.
56. A few days prior to September 26, 1952, the Government inspector at plaintiff’s plant for the first time informed plaintiff that all the bags on hand were unsatisfactory because the bottom seam was not sufficiently waterproof. His report under that date reads, in pertinent part, as follows:
IV. An additional factor has arisen which is expected to further contribute to the existing delinquency.
a. The undersigned has discovered that the intermediate packaging material (bag, waterproof, barrier material, type C-l) although passed as meeting requirements of JAN-P-125 by Philadelphia QM General Test *485 ing Labs, under laboratory report number 1712, does not pass visual inspection.
1. It was discovered that the manufacturer’s SEAL OF THE bag is very poor and allows free passage of water through the bottom seams. Under the most ■ elementary of tests (immersing the bottom seal of either a flat, folded bag or one fully sealed with required contents therein in water to a depth of three inches from time ranging from five seconds to three minutes) the bag failed in its primary requirement namely water-proofness of seams.
2. It has definitely been established by the undersigned that this failure is due to poor workmanship in sealing the bag. The manufacturer’s representative Mr. E. Berkenfield of Central States Paper & Bag Co. Inc. has admitted to the undersigned that the bags are not waterproof and that the Quartermaster is aware of this condition and has accepted this condition as being unavoidable. He has further stated that there are records to prove his statements. These records have not been seen by the undersigned and their existence is questioned.
8. While it is true that laboratory reports covering samples of the lot of bags in question have been found satisfactory and acceptable by the Philadelphia QM General Testing. Labs, it is pointed out that the majority of bags inspected by the undersigned show a definite failure which in the opinion of the undersigned is of such a serious nature that outright rejection of the entire quantity of this component now on hand, is recommended.
4. Upon discovery of this condition the contractor was advised that further production would result in a rejection of the packaged material. The contractor’s suggestion was that he open up all seals and reseal with approved adhesive. This was found satisfactory and packages examined proved acceptable. The cost of a continued operation of this kind does not render its adoption practical from the Contractor’s point of view, therefore all production has ceased pending resolution of the problem. As of this date the problem rests with the Central States Paper & Bag Co.
At that time, plaintiff had about 100,000 of the C-l bags on hand, all of which had been previously approved and accepted by the Government.
57. As stated in the inspector’s report of September 26, 1952, quoted in the previous finding, ah attempt was made *486 to solve the problem by opening the bottom seam of the bags and resealing it with an approved adhesive. This was done by hand. Not only was this costly, but it was impractical, as such a procedure would have greatly slowed down the production and packaging of the disinfectant. In addition, many of the bags thus resealed were rejected by the inspector. Consequently, this attempted solution was abandoned on or about September 25, 1952;
58. On September 29,1952, the Government put into effect a hold order prohibiting further use of the C-l bags until it could resolve the problem. Plaintiff thereupon immediately stopped the entire packaging line: it was able to continue production of the disinfectant for about a week but this too had to be stopped then because of the storage problem. This stoppage continued until the hold order was lifted about 30 days later.
59. On September 30, 1952, the Government inspector at plaintiff’s plant reported to his superiors in New York as follows:
III. At a conference attended by Mr. R. Berkenfield and Mr. Abrahamson of Central States Paper & Bag Co. Inc.; Mr. R. Faber, Asst. Chief Insp. QMID; Mr. J. Donlin, QMC Supervisor; Mr. S. Hunter, Contractor’s Representative; Mr. J. Ovardits, Contractor’s Chief Inspector; Mr. W. Douglas, QMC INSP; and the undersigned, the following facts were disclosed:
1. The Central States Paper & Bag Co. Inc. goes on record as saying, that :
a. Material in question does not meet requirements of JAN-P-125.
b. The Central States Paper & Bag Co., Inc. cannot produce nor can any other manufacturer produce a type C-1 bag to conform to JAN-P-125.
c. The Quartermaster Corps is aware of the above facts and being aware of them has accepted the known failure of these bags to meet Specification as unavoidable.
d. Central States Paper & Bag Co., Inc. will not attempt to deliver further material under the specification as presently existing if the C-l bags as now supplied are not acceptable under JAN-P-125.
IV. It should be pointed out that Helene Curtis Ind. Inc. holds affidavits from the Central States Paper & Bag Co., Inc. affirming that the material in question conforms to the requirements of JAN-P-125.
*487 V. All samples of type C-l bags submitted to the Philadelphia QM General Testing Laboratories to date have been accepted under accelerated test procedure.
VI. With the approval of Mr. R. Faber, Asst. Chief Insp. the undersigned has informed the Contractor, Helene Curtis Ind. Inc. that the entire quantity of C-l bags now on hand is subject to rejection if used in packaging the end item. A hold order is hereby given to Helene Curtis Ind. Inc. to stop all packaging until final resolution of this problem has been accomplished.
VII. The New York representative of the Central States Co. intends to submit samples of the bags in question to the Chief Inspector QMII) on 30 Sept. ’52, for his approval. It is pointed out that these samples may or may not be representative of the lot in question.
VIII. Retest samples of the bags have been sent to Philadelphia QM Labs, requesting that tests be made to determine waterproofness of the seams and closures. These samples were sent in under SAMPLE #52 dated 30 Sept. ’52 as a special request.
IX. It is requested that this problem be handled as expeditiously as possible, inasmuch as all production has ceased pending its resolution.
60. At the conference referred to in the previous finding, which was held on or about September 30, 1952, one of the representatives of Central States Paper and Bag Company made the suggestion that the bottom seam of the C-l bag (the seam that the Government was objecting to as unsatisfactory) be resealed by placing a tape over the seal and bringing it around the edges of the bag in order to make sure that a proper closure was effected. Plaintiff agreed to this, if it were acceptable to the Government. The Government’s resident inspector thought this might work out satisfactorily ; however, no decision was made at this conference.
61. (a) Following the conference held on or about September 30, 1952, referred to in the preceding finding, various other efforts were made to resolve the problem of the C-1 bag. Among other things, numerous experiments were made at plaintiff’s plant in which plaintiff cooperated, and the Quartermaster Laboratory at Philadelphia submitted the following report on its tests of the bottom seam of the C-1 bags:
Lab. Comments : Inspector requests specifically to test bottom seal according to JAN-P-125 for waterproof *488 ness. JAN-P-125 is a waterproof barrier spec, and not a bag spec, and therefore only states that the material shall be capable of being sealed to effect water-proofness equal to material itself.
The test conducted to test the waterproofness was arbitrarily chosen. The inside of the bags were sprinkled with water soluble dye and then the bags were submerged in water approximately 2 inches in depth. Water penetrated into the bags in approximately 15 minutes. A leakage test was performed whereby water was put into the bags. The bags leaked immediately. The bag seals are not equal to waterproofness of the paper.
Inspector States: Inspector believes bottom seal of bag is not waterproof and requests the laboratory specifically test bottom seal according to JAN-P-125 for water-proofness. Inspector further requests the corner seals and flaps to be checked for conformance to spec. Please expedite testing to minimize delinquency on this contract. Eetest of this sample is requested by R. Faber, Asst. Chief, Insp. N.J. Del Papap.
(b) On October 16, 1952, the contracting officer wrote the plaintiff as follows:
With reference to bags, barrier, used for packing 12 each pouches, Disinfectant, Chlorine, Food Service, on Purchase Order No. 5115, into an interior container, you are advised that report received from the Philadelphia QM Testing Laboratory states that the bags do not meet specification as to the proper water-proofness as required under Par. II-2b of specification JAN-P-125, and therefore these bags are unacceptable. However, this office will permit the use of these bags provided that the deficiency is eliminated by re-sealing the bottom or some other method which will afford proper waterproofing to the satisfaction of the Resident Inspector. Otherwise, it will.be necessary for you to obtain new bags meeting specification in its entirety.
With reference to the 155,424 packages boxed and ready for shipment, authority is granted to ship same, and the QM Inspection Division, this office, has been advised accordingly.
62. The provisions of the disinfectant specification MILD-11309 and of the JAN-P-125 specifications for “Packaging and Packing for Overseas Shipment — Barrier Materials, Waterproof, Flexible”, which relate to the C-1 bag problem, are as follows:
*489 MIL-D-11309
5.1.2.1.2 Liner requirements. — Each intermediate carton of twelve (12) pouches shall be wrapped in (or placed in a prefabricated bag made of) water-proof barrier material in conformance with Specification JAN-P-125, type C-1 or C-2. In addition, each shipping container shall be provided with a sealed case liner or prefabricated bag made of waterproof barrier material in conformance with Specification JAN-P-125, type L-2 or M. Closure and seams of intermediate carton wrap and case liner shall be completely sealed Avith a continuous seam of minimum % inch width water resistant adhesive in conformance with Specification JAN-P-140.
JAN-P-125
E-1f. Sealability. — Materials submitted for the fabrication of case liners, interior shrouds, or interior wraps shall be capable of being sealed by adhesives, heat seals, pressure seals (or tapes), to effect waterproofness of seams, joints, and closures equal to that of the material itself when fabricated in accordance with recommendations of the suppliers of the waterproof barrier material. (See par. H-3.)
*****
H-2b. Interior wraps. — “Interior wraps” are used to protect individual packages, or light parts, or sections of parts, against penetration of water. In all cases, packages or parts protected by “interior wraps” will be overpacked in boxes. All seams, joints, and closures shall be sealed with adhesives or other suitable materials to afford waterproofness equal to that of the interior wrap material itself. A minimum of 2-inch overlap shall be provided at all overlapping edges.
' 63. The foregoing provisions contained in specifications MIL-D-11309 and JAN-P-125 did not provide tests for waterproofness of the seams of the C-l bag, nor did they specify the design of the C-l bag. The specifications were ambiguous to the point that the resident inspector and the Government packaging expert who testified at trial gave conflicting interpretations. Whereas the resident inspector and the Quartermaster Laboratory in Philadelphia tested the C-l bags under their interpretations of JAN-P-125, the Government packaging expert stated that JAN-P-125 re *490 lated only to the paper to be used and not to the construction of C-l bags, and that the “notes” section of JAN-P-125, in which the quoted paragraph H-2b appears, would not in practice be considered to be a binding part of the contract but to be used only as a guide. Whereas the Government packaging expert advised that the only provision of the contract which was applicable to the bottom seam of the C-l bag was the last sentence of paragraph 5.1.2.1.2 of specifications MIL-D-11309 (quoted in the previous finding), the resident inspector stated that the sentence in question related directly only to the top seal of the C-l bag, and to its bottom seal only by construction if at all.
64. Although the contract provisions are ambiguous and lack waterproof tests for the C-l bag, it is reasonable to read into the contract an intention to require that the C-l bags should have had a degree of waterproofness commensurate with their intended use in the field under operating conditions which could be reasonably expected, which would be a degree of waterproofness less than the severe test to which the resident inspector put the bags as described in finding 56, but which was consistent with the degree of waterproofness provided by the method of correcting the bags which was finally approved.
65. On October 23, 1952, another conference was held at plaintiff’s plant in an effort to resolve the still unresolved problem of the C-1 bag. At this conference, one of the Government’s representatives suggested that, after the carton of 12 pouches had been placed in the C-1 bag, a liquid adhesive be applied manually to its bottom seam, the bond being effected by the weight of the carton inside the bag. This suggestion was taken under advisement in order to determine whether or not it would be acceptable to the various Government officials involved. Subsequently, and after further experimentation, it was decided by the Government that this suggested procedure would unduly slow down the production line and that, instead, the plaintiff should tape the bottom seam of the bags before they were put on the production line, as had been originally suggested at the September 30th conference by Central States Paper and *491 Bag Company and concurred in by plaintiff at that time. Thereupon, and on or about October 29, 1952, the Government’s hold order was terminated and plaintiff resumed production. In subsequently using the C-1 bags, plaintiff applied tape to the bottom seam in accordance with the Government’s direction.
66. During the period when the hold order was in effect (approximately 30 days), various devised tests were experimented with and finally one was adopted (a spray test) and used in checking the bottom seam of the C-l bags after they had been taped by plaintiff, as previously described. Subsequently, the Government made appropriate revisions of the specification and, after plaintiff had used up its supply of C-1 bags, a new type of bag, to be used in lieu of the C-1 bag, was provided for in a change order, at no additional cost to the Government.
67. The delay due to the hold order was not the fault of the plaintiff but was almost entirely attributable to the ambiguity in the specifications and the defendant’s failure to act promptly enough in solving the problem.
68. Plaintiff made a claim against Central States Paper and Bag Company, dated March 25,1953, for approximately $3,200 in excess costs as a'result of the C-l bag controversy. Plaintiff settled with Central States in June of 1953 for a recovery by plaintiff from Central States of approximately $1,100. The claim asserted against Central States by plaintiff was in part for costs incurred by plaintiff after the hold order was lifted (mainly for taping the bottom seams of the C-l bags in accordance with the arrangement agreed upon by the Government and the plaintiff) and in part was similar to the claim now asserted against defendant for costs incurred' while the hold order was in effect; but the amount actually recovered from Central States was attributable only to the costs incurred after the lifting of the hold order.
69. During the period of approximately 30 days when the hold order was in effect pending the resolution of the C-l bag problem, plaintiff incurred the following costs which it would not otherwise have incurred:
*492 Material used- $489.20
Labor_ 1,446. 96
Overhead_ 1,496. 74
3,432.90
G & A — 8 percent- 274.63
Total_ 3, 707. B3
The material was for C-l bags used in trying to work out a solution to the C-l bag problem. The labor was for standby labor occasioned by the hold order and for labor actually used in the experimentation that was carried on in plaintiff’s plant in attempting to resolve the C-l bag problem. The overhead and general and administrative items are costs audited and agreed to by the Government.
70. Plaintiff has formally withdrawn its “pouch-material claim”, which claim is set out as the third cause of action in plaintiff’s petition at pages 6-7.
71. Plaintiff submitted a claim to the contracting officer covering excess costs on the first contract and the C-l bag claim. The contracting officer advised that he was without authority to effect any adjustment. He advised of the possibility of filing a claim under the .provisions of Title II of the First War Powers Act, 1941, as amended, for equitable relief in appropriate cases. On March 10,1953, a claim was filed under Title II by plaintiff. It was denied by letter dated July 9, 1954. No claim was ever made against the Government for losses alleged to have been incurred under the second contract, because the contracting authority has held himself to be “without authority” to grant similar relief under the comparable first contract.
72. No action on claims involved in this suit has been taken by the Congress or by any department of the Government or in any judicial proceeding except as detailed in the finding relating to claims under the first contract set forth above. Plaintiff is the sole owner of the claims involved and there have been no assignments or transfer of them, or any part of them.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and it is therefore *493 adjudged and ordered that plaintiff recover of and from the United States the sum of sixty-four thousand and twenty-two dollars and ninety-one cents ($64,022.91).

 Ragonese v. United States, 128 Ct. Cl. 156, 161-62, 120 F. Supp. 768 (1954); Bateson-Stolte, Inc. v. United States, 145 Ct. Cl. 387, 391, 393-94, 172 F. Supp. 454, 456, 458 (1959) (the same case, No. 141-57, 158 Ct. Cl. 455, 305 F. 2d 386 (1962); Snyder-Lynch Motors Inc. v. United States, 154 Ct. Cl. 476, 479-80, 292 F. 2d 907, 909—10 (1961); see also General Casualty Co. v. United States, 130 Ct. Cl. 520, 528, 127 F. Supp. 805, 809 (1955), cert. denied, 349 U.S. 938; Leal v. United States, 149 Ct. Cl. 451, 460, 276 F. 2d 378, 383 (1960); Potashnick v. United States, 123 Ct. Cl. 197, 218, 105 F. Supp. 837, 839 (1952).

 Even for a new product lite this chlorine disinfectant or a new ingredient like chlormelamine, the Government would not necessarily be required to volunteer all of its information. The scope of the required disclosure would depend upon such factors as the state of the bidders’ knowledge, the significance of the particular information to the performance of the contract, the ease of discovering the information from other sources, the Government’s understanding of the importance of its information, etc.

 Plaintiff suspected as early as May 1952 that a possible cause of its difficulties was lack of uniformity between the different batches of chlormela-mine being delivered by Wallace & Tiernan. It was not until September 1952 that it definitely discovered that this was actually so and that the supplies of chlormelamine were not uniform from batch to batch. And it was not until December 1952 that plaintiff discovered that Wallace & Tiernan Was blending several batches together and shipping blended chlormelamine.

 Conversely, the end product particle size requirement was a maximum.

 See Brand Investment Co. v. United States, 102 Ct. Cl. 40, 58 F. Supp. 749 (1944), cert. denied, 324 U.S. 850 (1945); Severin v. United States, 102 Ct. Cl. 74 (1943); George A. Fuller Co. v. United States, 108 Ct. Cl. 70, 94, 96, 69 F. Supp. 409, 411-12 (1947); Volentine and Littleton v. United States, 144 Ct. Cl. 723, 169 F. Supp. 263 (1959); F. H. McGraw and Co. v. United States, 131 Ct. Cl. 501, 506-07, 130 F. Supp. 394, 397 (1955); Oliver-Finnie Co. v. United States, 150 Ct. Cl. 189, 279 F. 2d 498 (1960); Donald M. Drake Co. v. United States, 153 Ct. Cl. 433, 440-41 (1961); William A. Smith Contracting Co., Inc. v. United States, 155 Ct. Cl. 1, 9-12, 292 F. 2d 847, 852-53 (1961).

 Special Chlormelamine used here was one of the earlier batches obtained from Wallace & Tiernan. * » * It Is the same used In the earlier samples of 1C which we submitted over a year ago.

 when, throughout these findings, mention is made of the “solubility” test or the test for “solubility”, the reference is to the test set forth in paragraph 4.6.5.1 of the miliary specification. This is in reality a test for rate of going into solution.

 Plaintiff originally planned to subcontract the task of packaging the disinfectant in pouches but ultimately determined to perform this labor itself.

 This item refers to freight on shipments of chlormelamine from the supplier to plaintiff and freight in connection with the planned subcontracting of the packaging of the disinfectant in pouches as discussed in note 1.

 The difference between the $0.15468 figure above and the $0.15449 obtained by averaging the unit cost figures if.o.b. origin) contained in the actual bid is due to the averaging and to minor changes by plaintiff.

 The total material figure in plaintiff’s bid estimate is slightly higher than the sum of the individual material costs contained in the estimate.

 The difference between the $0.13221 figure above and the $0.13290 obtained by averaging the unit figures (f.o.b. origin) contained in the actual bid is due to the averaging and to minor changes in the bid figures.

 These bids were approximately more per unit than the plaintiff’s bid on the first contract and approximately 3^ per unit more on the second contract.

 See note to finding 19.

 See note to finding 19.

 See note to finding 25.

 Burden was computed at 80 percent of direct labor on the first contract and at 60 percent of direct labor on the second contract. See findings 19 and 25.

 The difference between tile “total bid” and “Total bid (F.O.B. origin) as submitted” figures results from minor changes made by plaintiff in its actual bid. See note c, finding 19, and note b, finding 25. The award on the second contract included some shipments f.o.b. destination. The bid figures for this contract have been adjusted to exclude freight and are thus comparable to the figures for the first contract, upon which the award was exclusively f.o.b. origin.

 Cost for 2,251,000 units.

 Cost for 3,309,000 units. Although the award on this contract included some f.o.b. destination shipments, freight costs have been excluded in order to make these cost figures comparable with the bid and cost figures for the first contract and the bid figures on this contract. See note e, finding 52.

 The one-third attribution is necessarily based on an informed and reasoned judgment instead of on a precise allocation provided by the record, for by the nature of such a determination it would not be possible for the parties to offer dependably precise data.